COMMONWEALTH OF PUERTO RICO, ETC., Plaintiff and Appellant, *v.* 12,974.78 SQUARE METERS IN WARD OF CONTORNO OF THE MUNICIPAL DISTRICT OF TOA ALTA, PUERTO RICO ET AL., Defendants and Appellees.

No. R-62-123. Decided June 2, 1964.

*J. B. Fernández Badillo, Solicitor General,* and *María Luisa B. Fuster, Assistant Solicitor General,* for appellant. *Félix Ochoteco, Jr.,* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

For the public purposes carried out by the Urban Renewal and Housing Corporation of Puerto Rico, the Government of Puerto Rico condemned in 1960 a parcel of land situated in the ward of Contorno of the Municipality of Toa Alta. That parcel has an area of 3.3 cuerdas and was segregated from a property of 109 cuerdas. Initially the Government deposited in the Superior Court the sum of $8,912.97 for the payment of that land, but afterwards the parties stipulated the price of $11,553.85, that is, at the rate of $3,500 per cuerda. Federico López and/or his son Andrés López owned, for at least 40 years, certain buildings devoted to the dairy business situated on the said property, but not on the parcel taken.[1]

The parties stipulated at the hearing of the case that the only material issue for decision was whether the State was bound to pay defendant the cost of removing or substituting the buildings of the dairy which were situated at a distance of less than 200 meters from the lands taken for residential purposes. In the affirmative case the sum of $9,446.15 was fixed as the cost of removing the buildings. It was agreed to stipulate further that the dairy business had continued to operate and was operating at the time of the trial (September 7, 1961) by virtue of the license issued by the Department of Health of Puerto Rico, notwithstanding the fact that those buildings were situated at less than 200 meters from the urban zone. I Tr. Ev. 2.

---

[1] In its findings of fact the trial court says that the license under which that dairy operated was originally issued in favor of Federico López, and that afterwards, on August 2, 1948, it was changed in the name of Andrés López, defendant's son, but that notwithstanding the license was issued in favor of Andrés López since the aforesaid date, the production of milk has been sold at all times in the name of his father, Federico López del Valle.

There is no question that this stipulation arose because the regulation of the Department of Health concerning dairies, 24 R.&R.P.R. § 790–1 *et seq.*, contains the following two provisions:

"Section 790–26. *Location of dairies.*

It shall be illegal to establish a dairy at a distance of less than 200 meters from the urban zone."

"Section 790–27. *Changes in condition of surrounding area.*

In the event that, due to the growth of the town, the latter shall approach any dairy already established, the Secretary of Health may withdraw the license if, in his opinion, conditions of the dairy or of the urban zone endanger the public health in the urban zone, or the intervening neighborhood endangers the purity of the milk produced at the dairy."

The Superior Court concluded that in order to continue operating the dairy in question it was "absolutely necessary to remove those buildings" from the place where they were situated, and that therefore the remainder of the property had sustained severance damages which plaintiff was bound to compensate to defendant. Finding of Fact No. 11.

Plaintiff-appellant alleges that the trial court erred (a) in holding that as a result of the taking defendant was bound to remove the establishment of the dairy which operated in the uncondemned part of the property; (b) in making a determination (the need of removing the dairy) which was incumbent on the Secretary of Health in the first instance; and (c) in ordering plaintiff to pay to defendant the sum of $9,446.15 as compensation for the removal of the dairy.

■ We shall discuss jointly the errors assigned. Of the two provisions cited above of the regulations of the Department of Health, the former (§ 790–26) declares illegal the establishment of a dairy at a distance of less than 200 meters from the urban zone. By its own terms and according to natural reason, that provision is prospective in character. It does not cover those dairies which were already established within the limit of 200 meters. The following section

(790–27), also cited above, made provision for the case of those dairies which are already established. The documentary evidence showed that the plan which fixed the urban zone of the town of Toa Alta was approved on January 2, 1948, when the dairy in question was already established at that place and was situated at less than 200 meters from the urban zone thus fixed. Hence, § 790–26 of the regulation was not applicable to that dairy, which obtained a license to continue operating on August 28, 1948, notwithstanding it was situated at less than 200 meters from the urban zone. However, the dairy was covered by the terms of § 790–27 *supra*.

Section 790–27 *supra* provides that "In the event that, due to the growth of the town [as in the case at bar], the latter shall approach any dairy already established, the Secretary of Health *may* withdraw the license if, in his opinion, conditions of the dairy or of the urban zone endanger the public health in the urban zone, or the intervening neighborhood endangers the purity of the milk produced at the dairy." (Italics ours.)

 If already in 1948 the dairy was situated at less than 200 meters from the urban zone of Toa Alta, the condemnation in 1960 certainly did not place it within the limit of precariousness. Aside from this, is it correct to assert, juridically speaking, that it was absolutely necessary to remove the buildings of the dairy from the place where they were situated? It is not. Section 790–27 of the regulation does not have the inflexible and mandatory nature of the preceding section. It must be recalled that the previous section declares illegal the establishment of dairies at a distance of less than 200 meters from the urban zone. On the contrary, the section to which we make reference now (790–27) and which applies to this situation grants discretion to the Secretary of Health to withdraw or not the licenses of those dairies which are situated near the urban zone whenever by

reason of the growth of the town the latter shall approach any dairy. That section provides that the Secretary of Health *may* withdraw the license in those cases if, *in his opinion*, the conditions in each specific case endanger the public health or the purity of the milk, which is another way of endangering the public health.

In the case at bar defendant's license was not withdrawn by the Secretary of Health so that, in removing the buildings, defendant did it *motu proprio* and not as a direct result of the taking.

■■ The determination that owing to the growth of the town the dairy endangered the public health rested initially with the Secretary of Health. This reality is labeled by the authority as doctrine of primary jurisdiction. This doctrine operates to determine which agency, whether the judicial or the administrative, should make the initial determination on the matter, and applies specifically when the situation presents issues requiring the exercise of administrative discretion, *United States* v. *Western Pac. R. Co.*, 352 U.S. 59, 63 (1956). This doctrine maintains that the initial determination rests in the administrative agencies or the administration concerned, *United States* v. *Western Pac. R. Co., supra.* It is a question, as has been said, of priority of jurisdiction, *Apgar Travel Agency* v. *International Air Trans. Ass'n,* 107 F.Supp. 706, 711 *ab initio* (1952). This is so even though the situation or controversy, after it has been appraised by the competent administrative agency, may serve as a premise for judicial review, *Far Eastern Conference* v. *United States,* 342 U.S. 570, 574 (1952). See, also, Annotation, *"The doctrine of primary administrative jurisdiction,"* 1 L.Ed.2d 1596.

The doctrine of primary jurisdiction can be traced directly to the celebrated opinion of Mr. Justice White (later Chief Justice) in *Texas & Pacific Railway Co.* v. *Abilene Cotton Oil Co.,* 204 U.S. 426 (1907). That doctrine was

firmly reiterated by the Supreme Court of the United States in the oft-cited case of *Far Eastern Conference* v. *United States, supra* at p. 574, in which the court said: "The Court thus applied a principle, now firmly established, that in cases . . . requiring the exercise of administrative discretion . . . agencies [administrative] . . . should not be passed over."

■ The scholars of American administrative law are of the opinion that few aspects of that discipline have been so systematically and uniformly sustained as the doctrine which we discuss here. See 3 Davis, Administrative Law Treatise 6 (1958) ; Schwartz, in 41 Geo. L.J. 495 (1953). It has been termed the keystone of administrative regulation, 51 Harv. L. Rev. 1251 (1938). It is easy to understand it to be so. If the courts were to make in the first instance the determinations which the statutes require the administrative agencies and administrators to make, so great a confusion would be created that it would be practically impossible to administer, executively and judicially, the administrative law. As pointed out by the Supreme Court of the United States in *United States* v. *Western Pac. R. Co., supra* at p. 63, the doctrine of primary jurisdiction, like the other requiring exhaustion of administrative remedies before invoking the judicial remedies, is concerned with promoting proper relationship between the courts and administrative agencies. Schwartz is of the opinion that if the contrary were made the law would revert to the regrettable state such as that which prevailed when both jurisdictions, common law and equity, were distinct and competing systems (in Anglo-Saxon law), 41 Geo. L.J. 504. Davis is of the opinion that the principal reason behind the doctrine of primary jurisdiction is recognition of the need for orderly and sensible co-ordination of the work of administrative agencies and of the courts of justice, 3 Administrative Law Treatise 5 (1958). Commenting on the *Abilene* case *supra* in which Mr. Justice White created the doctrine, Von Mehren says that in that

manner the Supreme Court took a long step toward accommodation of the courts with the agencies. 67 Harv. L. Rev. 934 (1954).

■ The rule which we discuss applies equally when the judicial action is brought by a private litigant or by the Government, *Far Eastern Conference* v. *United States, supra* at p. 576.

■■ The doctrine of primary jurisdiction should not be confused with the doctrine requiring the exhaustion of administrative proceedings before gaining access to the courts,[2] although both are germane and pursue the same end: to establish order in the administration of justice and to harmonize the functions of the judicial branch with its sister branch, the executive. The doctrine requiring the exhaustion of administrative proceedings determines at what stage a party may resort to the courts; that of primary jurisdiction determines which agency should make the initial decision of the matter. See Davis in 28 Texas L. Rev. 400 (1950).[3]

Whenever it is proper, the courts have a right to know what has been the administrative interpretation before deciding controversies, and, on the contrary, they do not decide them on the basis of speculative or hypothetical interpretations of the parties, *Public Utilities Commission of California* v. *United States*, 355 U.S. 534, 539 (1958). As we have seen, in the case at bar the regulation requires the Secretary of Health to determine before withdrawing the license whether the dairy endangers the public health, and in this case the Secretary did not make any such determination.

Naturally, nothing of what we have stated prevents an owner from relocating his buildings in the exercise of his own

---

[2] *Labor Relations Board* v. *Ortega*, 79 P.R.R. 714, 718 (1956); *Myers* v. *Bethlehem Corp.*, 303 U.S. 41 (1938); *Macauley* v. *Waterman S.S. Corp.*, 327 U.S. 540 (1946).

[3] The article on the matter by Professor Davis, "*Administrative Law Doctrines of Exhaustion of Remedies, Ripeness for Review, and Primary Jurisdiction*," 28 Texas L. Rev. 168, 376 (1950), is of special interest.

judgment, but, as commented by Orgel, he has no right to public compensation. 1 Orgel, Valuation Under Eminent Domain 309 (2d ed. 1953).[4]

For the reasons stated above, we conclude that the errors assigned were committed and, consequently, the judgment rendered by the Superior Court in this case in the sense of decreeing that the just compensation which plaintiff is compelled to pay to defendant is only the sum of $11,553.85, which was the price stipulated by the parties for the land taken, will be modified and as thus modified it will be affirmed.

---

[4] We also wish to point out that in a case in which condemnation does not play a part and in which it is necessary for the Secretary of Health to withdraw a license for the reasons set forth in § 790-27 (growth of town, danger to public health), there would be no right to compensation, since it would be an exercise of the police power of the State and in that case compensation does not lie, *Goldblatt* v. *Town of Hempstead,* 369 U.S. 590, 592 (1961); *Walls* v. *Midland Carbon Co.,* 254 U.S. 300 (1920); *Hadacheck* v. *Sebastian,* 239 U.S. 394 (1915); *Reinman* v. *Little Rock,* 237 U.S. 171 (1915); *Mugler* v. *Kansas,* 123 U.S. 623 (1887); *Texaco, Inc.* v. *Secretary of Public Works,* 85 P.R.R. 686 (1962).