## TYSCO OIL CO. v. RAILROAD COMMIS-SION OF TEXAS et al.
### No. 694.

District Court, S. D. Texas, Houston Division.
Sept. 24, 1935.

See, also (D. C.) 12 F. Supp. 202.

Henry Yeager and D. A. Frank, both of Dallas, Tex., for plaintiff.

William McCraw, Atty. Gen., and Archer D. Gray, Asst. Atty. Gen. of Texas, and J. E. McWhorter, E. J. Fountain, Jr., and Andrews, Kelley, Kurth & Campbell, all of Houston, Tex., for defendants.

Turner, Rodgers & Winn and C. R. Winn, all of Dallas, Tex., for intervener.

Before HUTCHESON, Circuit Judge, and KENNERLY and McMILLAN, District Judges.

KENNERLY, District Judge.

February 14, 1935, before the discovery and production (on June 13, 1935) of petroleum oil and gas in the city of South Houston, in Harris county, in this district and division, the mayor and city commissioners or aldermen of the city, purporting to act under the laws of Texas (title 28 of the Texas Revised Civil Statutes 1925 and Amendments [Vernon's Ann. Civ. St. Tex. art. 961 et seq.]), regulating cities and towns and villages, passed and adopted an ordinance, extensively regulating the search for, drilling for, production, etc., of oil and gas within the city. August 5, 1935, the Railroad Commission of Texas, purporting to act under the Conservation Laws of Texas (title 102, Texas Revised Civil Statutes 1925 and Amendments [Vernon's Ann. Civ. St. Tex. art. 6004 et seq.]), passed and adopted special rules or orders (in addition to its General Rules previously adopted), governing the search for, drilling for, and production of oil and gas in the South Houston Oil Field, including the city of South Houston. August 15, 1935, the plaintiff, Tysco Oil Company, the owner of certain land or lots in the city, filed this suit against defendants, the city of South Houston (for convenience called "city"), its mayor, secretary, and commissioners or aldermen (for convenience called "city officers"), and the Railroad Commission of Texas (for convenience called "Railroad Commission"), attacking as constitutionally invalid under the Federal Constitution such ordinance and orders. August 29, 1935, the Stanolind Oil & Gas Company (for convenience called "intervener") intervened

and joined with defendants in combatting plaintiff's claim.

The jurisdiction is under subdivision 1 of section 41, title 28, USCA, in that the matter in controversy, exclusive of interest and costs, exceeds $3,000, and arises under the Constitution and laws of the United States.

Plaintiff, in its bill, having prayed for interlocutory injunction against all defendants, restraining the enforcement of such ordinance and orders, a statutory three-judge court was organized (section 380, title 28 USCA), and the hearing of the application for interlocutory injunction against all defendants was set for the same time and place. Upon the convening of the court, it clearly appearing that only the suit against the Railroad Commission presented a case for the consideration of the three judges, and that the suit against city and city officers presented a case for the consideration of the district judge of the district alone,[1] it was agreed by all parties, with the approval of the court, that the matter of plaintiff's application for interlocutory injunction be heard, but be regarded as submitted to and be decided by the tribunal having jurisdiction. Amazon Petroleum Corporation v. Railroad Commission (D. C.) 5 F. Supp. 633; Ryan v. Amazon Petroleum Corporation (C. C. A.) 71 F.(2d) 1, 3.

This is the hearing on bill, answer, intervention, and supporting affidavits, of plaintiff's application for preliminary injunction against the Railroad Commission. The facts fairly deducible therefrom are as follows:

(a) About 1907, the Western Land Corporation et al. subdivided into lots and blocks, with the usual streets, alleys, etc., approximately 2,000 acres of land, situated in Harris county between Houston and Galveston, and about twelve miles from Houston. The subdivision was called, and has been since generally known as, "South Houston." Lots were sold from time to time to many different persons, who in turn sold to others, so that at this time they are owned, and for a number of years have been owned, by many hundred (perhaps more than 2,000) widely scattered persons.

(b) The city of South Houston, constituting a part of such subdivision, was duly and regularly incorporated as a village or town under the laws of Texas, April 19, 1915, and on February 8, 1927, duly accepted (article 961 et seq., Texas Revised Civil Statutes 1925 and Amendments [Vernon's Ann. Civ. St. Tex. art. 961 et seq.]), the provisions of title 28 of such statutes, and thereby became vested with all the rights, powers, and privileges conferred upon cities, towns, and villages by such title.

(c) Such incorporated city includes, and included at the date of the ordinance complained of, 1,306 acres of land, divided into 302 blocks, varying in area from ⅛ of an acre to 6 acres, and into 4,490 lots, of which 4,042 are in size 50x142 feet, the balance being larger. In the city there are 318 buildings, of which 157 are residences, and 64 business houses, of which 18 are used in the manufacture and storage of explosive fireworks, and 5 are filling stations. There are two church buildings, and two school buildings, besides some large buildings formerly used as a school for boys, but now used as a county hospital for transient persons. Extending through the city is a very heavily traveled concrete state highway for automobiles, etc., from Houston to Galveston, with a branch highway to La Porte and other bayshore towns, one railroad line, the trains over which are propelled by steam engines with boilers fired by coal and oil, and one electric interurban line, over which railroad and interurban lines there pass at frequent intervals trains transporting persons and property.

(d) Early in 1935, it became apparent to city and city officers that one Johnson, representing or purporting to represent intervener, was taking oil and gas leases from many owners of lots in the city, looking to a search for, and if found the production of, oil and gas, and it appeared to them necessary and desirable that the drilling of wells for and production therefrom of oil and gas be regulated in order to guard and protect the persons, lives, and property of the people in the city, and of those passing through the city, from the dangers and hazards of the escape of gas, fire, explosions, cratering, and other similar dangers incident to oil fields and the production of oil and gas. Accordingly, the ordinance which plaintiff is attacking was duly passed and adopted February 14, 1935, and thereafter duly published as required by law, and became and is now effective.

(e) Such ordinance provides that the city shall be (and it was) subdivided into

---

[1] See (D. C.) 12 F.Supp. 202.

drilling districts "of four (4) normal sized blocks each, or approximately equivalent area, in as compact form as practicable." Each drilling district contains approximately 16 acres. It is made unlawful to drill a well for oil and gas except in accordance with such ordinance, and without à permit from the city, or more than one well in a drilling district, or to drill a well in any of the streets and alleys of the city.

Sections 3, 4, and 7 of the ordinance being important in connection with the questions raised here, it seems proper to quote them:

"Section 3. That in case a permit for the drilling of a well be issued to a person, persons, or corporation not owning or holding oil and gas leases, or drilling contracts with the owners of all the area in a drilling district, it shall be a condition of the permit that the permittee, its successors and assigns, shall deliver to the credit of each of such owners whose land shall not be under lease held by the permittee, free of cost, in the pipe line to which the well may be connected, a share of oil produced and saved from such well, equal to one-eighth of the proportion of the whole production that the square feet of ground so owned bears to the square feet contained in such drilling district, exclusive of the streets and alleys, and a like proportion of the proceeds of gas and casinghead .gas produced from the well and used off the premises.

"Section 4. That in case there be applications filed with the City Secretary and pending at the same time for permits to drill in any one drilling district in the City, by more than one applicant, that application shall be granted, if otherwise sufficient, which shall be made by the person, association, or corporation holding the greater area of the ground in the drilling district by ownership in fee, or by lease or other contract with the owner or owners, permitting the drilling thereon for oil or gas; but, in case a permit be issued to persons or corporations who do not own or hold leases or other valid drilling contracts in writing from the owners of all of the land within the said district other than streets and alleys, any owner of unleased land in the said drilling district and any person or corporation other than the permittee, holding oil and gas leases on land in the drilling district, shall have the right to share in the ownership and benefits of such oil or gas well in the proportion that the area of

his or its land or lease bears to the area of the drilling district exclusive of streets and alleys, provided that within ten days from the date of the issuance of such permit, he or it shall file with the City Secretary his or its election in writing to pay to the holder of the permit or his or its assigns, a like proportion of the total cost and expense of drilling and operating the well and shall within that time make and file with the City Secretary a bond with an authorized surety company as surety and in an amount representing that portion of the estimated maximum cost of the well that the area of ground owned or held under lease by the principal bears to the whole area of the drilling district conditioned that the principal in the bond will pay to the permittee and his assigns such proportion of the cost of drilling and operating the well, from time to time, as required in the drilling and operation thereof, such bond to be approved by the Mayor and held by the City Secretary for the benefit of all persons interested."

"Section 7. The City Council shall have the power, and reserves the authority to refuse any application for a permit where, by reason of the location of the proposed well and the character and value of the permanent improvements already erected on the drilling district in question or adjacent thereto, and the use to which the land and surroundings are adapted for civic purposes or for sanitary reasons, the drilling of an oil or gas well will be a serious disadvantage to the City and its inhabitants as a whole; but when a permit shall be refused for any of these reasons the deposit of cash made with the application shall be returned to the applicant. Except as hereinbefore provided, if an application complies in all respects with the terms of this Ordinance, the City Secretary shall issue a permit for the drilling of a well applied for, but no single application shall be made for a permit covering more than one drilling district, as herein defined. The permit shall specify the particular location of the well to be drilled, and it shall be unlawful for the permittee to drill elsewhere in the drilling district. The granting and issuance of a permit as in this Ordinance provided, shall automatically operate as a rejection and denial of all other applications for a permit or permits covering the drilling district or any portion or portions thereof, included within and covered by the permit so granted, and which applications

are pending at the time of the granting of such permit or may be filed during the life thereof."

The ordinance also provides for a fee of $100 to the city for each application to drill a well, prescribes the wording of such application, requires bond to accompany same, and provides for notice of and hearing on such application. The city reserves the right to refuse any application for a permit.

It is made unlawful by such ordinance to erect or use within 300 feet of a building, a drilling rig without inclosing it on all sides and equipping it with fire extinguishers, etc. A violation of the ordinance is punishable by a fine of $100, each day's violation being a separate offense.

(f) Plaintiff owns oil and gas leases on nine widely separated lots (50x142 feet each) within the limits of city. Each of the nine lots is located within one of the drilling districts into which the city was divided under such ordinance. The balance of the lots in each of such drilling districts, and any oil leases thereon, is owned by others.

Plaintiff also owns oil and gas leases on three groups of lots, one group being two adjoining lots (each 50x142 feet) in one block, another group being two similar adjoining lots in another block, and the third group being three similar adjoining lots in still another block. Each group is widely separated from the other groups and from plaintiff's other lots, and is in a different drilling district. The balance of the lots in each of said drilling districts, and any oil and gas leases thereon, is owned by others.

All of the oil and gas leases on such lots were acquired by plaintiff after the passage of such ordinance and the division of the city into drilling districts.

(g) Plaintiff also owns oil and gas leases on approximately 12 acres of land in a body, only a part of which, however (lots 5, 6, and 8, and the south one-third of lot 7, in block D, of Manufacturing Sites in the city), is described in plaintiff's bill and made the basis of plaintiff's complaint here. The lots described in the bill are not in a body, but are in two disconnected tracts.

Approximately 5 acres of the 12 acres (including all of lot 8 in block D) was owned at the time of the division of the city into drilling districts, and had been owned since about 1928, by G. W. Christy, and in such division was placed wholly in drilling district 52. The balance of such drilling district 52, and any oil and gas leases thereon, was then, and is now, owned by others. Plaintiff's oil and gas lease on said 5 acres was obtained after such division.

Approximately 7 acres of the 12 acres (including lots 5 and 6 and the south one-third of lot 7, in block D, described in the bill) was owned, at the time of the division of the city into drilling districts, by H. A. Christy, and had been so owned since about 1928. Lots 5 and 6 were placed in drilling district 53, the balance of which, and any oil and gas leases thereon, is owned by other persons. The south one-third of lot 7 was placed in drilling district 52, the balance of which, and any oil and gas leases thereon, is owned by other persons. The division line between lots 6 and 7 is part of the division line between drilling districts 52 and 53.

Had either the entire 7 acres owned by H. A. Christy, or the portion thereof involved in this suit, been placed in the same drilling district, he would not have owned the major portion of the property in such drilling district. Had all of the property of G. W. Christy and H. A. Christy been placed in the same drilling district, they would have owned the major portion of such drilling district, and they, or plaintiff, who owns oil and gas leases under them, would have been, in so far as the ordinance was concerned, and under the provisions thereof, entitled to drill a well for oil and gas in such drilling district by complying with such ordinance.

There is no evidence of any protest by H. A. Christy with respect to his tract of land being included in two drilling districts, nor is there any evidence of any protest by either or both of the Christys that their lands were not placed in one drilling district.

Plaintiff's leases on the Christys' lands were taken about three months after the passage of such ordinance and such division thereunder was made by the city, and with full notice and knowledge thereof.

The evidence shows no fraud nor bad faith on the part of the defendants who subdivided the city into drilling districts, and no "gerrymander" of the city in favor of or against plaintiff, or its lessors, or any other person or persons.

(h) The 12 acres of land upon which plaintiff has leases is located near the geographical center of the city, and in approximately the business center, and immediately east of and adjoining the right of way and tracks of the railway line hereinbefore mentioned, upon which trains are operated at frequent intervals, and immediately across such right of way to the west is located the heavily traveled state highway between Houston, La Porte, and Galveston. In a southerly direction from the 12 acres and a distance of a few hundred feet, and likewise on or near such railroad and highway, are located buildings belonging to the Texas Fireworks Company, and used for the storing of explosive fireworks. It is shown that the drilling of a well for oil and gas on these 12 acres would be accompanied with much danger to persons and property in the city and passing through the city, from the standpoint of fires, explosions, gas blow-outs, cratering, etc.

(i) Acting under the Conservation Laws of Texas, the Railroad Commission has, from time to time, passed and promulgated its rules, covering the production of oil and gas in the various oil fields in Texas. Among these rules is rule 37, adopted in 1919, and amended from time to time, making provision for the spacing of wells in such oil field. Rule 37, among other things, provides that no well for oil or gas shall be drilled nearer than 300 feet to any other completed or drilled well on the same or adjoining tract or farm, nor nearer than 150 feet to any property line, lease line, or subdivision line. Such rule provides, however, that the commission, in order to prevent waste, or to prevent the confiscation of property, will grant exceptions to permit drilling within shorter distances whenever the commission determines that such exceptions are necessary either to prevent waste or to prevent confiscation of property. Such rule also provides that such exceptions shall be granted only after at least 10 days' notice to all adjacent persons and lessees affected thereby, and after public hearing in which all interested persons may appear and be heard, and after the commission has determined that an exception is necessary in order to prevent waste or to protect property from confiscation. It also provides that the commission may grant exceptions to the rule in oil fields where the production is obtained from certain kinds of formations, and also provides

that in the interest of protecting life and property, and for other just and reasonable causes, the commission reserves the right in particular fields to enter special rules or orders increasing the minimum distances provided by such rule.

Such rule also provides that any well drilled in violation thereof, or without a special permit obtained in the manner prescribed in the rule, shall not be permitted to produce either oil or gas, and the same shall be plugged, etc.

In many of the oil fields in Texas, the Railroad Commission has, either of its own motion or upon application of interested persons, adopted special spacing rules or orders for that particular field, sometimes decreasing and sometimes increasing the minimum distances between wells and/or between wells and boundary lines prescribed by such rule.

Plaintiff does not, however, in its bill, complain of rule 37.

(j) Among the lots mentioned in paragraph (f) hereof on which plaintiff owns an oil and gas lease are lots 4 and 5, block 79 (50x142 feet each). Such lease is held under Marie Robertson. Said lots are located in drilling district 18, and on or about June 1, 1935, Marie Robertson made application to the Railroad Commission for an exception to rule 37 on said lots and for permits to drill a well or wells thereon.

Also lot 2, block 92 (50x142 feet) held under Henry Yeager, and located in drilling district 32. On or about June 1, 1935, Henry Yeager made application to the Railroad Commission for an exception to rule 37 on said lot and for permits to drill a well or wells thereon.

Also lot 13, block 44 (50x142 feet) held under Henry Yeager, and located in drilling district 10. On or about June 1, 1935, Henry Yeager made application to the Railroad Commission for an exception to rule 37 on said lot and for permits to drill a well or wells thereon.

Plaintiff joined in such applications, but neither plaintiff nor such persons have made, under the ordinance, application to city for permits to drill wells on said lots.

(k) On or about June 1, 1935, G. W. Christy, the owner, as hereinbefore stated, of lot 8, block D, located in drilling district 39, made application to the Railroad Commission for an exception to rule 37 on said lot and for permits to drill a well or wells thereon, and about June 1, 1935, H.

A. Christy, the owner of lots 4 and 5, in drilling district 53, and south one-third of lot 7, block D, in drilling district 52, made application to the Railroad Commission for an exception to rule 37 on said lots and for permits to drill a well or wells thereon.

Plaintiff joined in such applications, but neither the Christys nor plaintiff have made application to city, under the ordinance, for permits to drill wells on such property.

(1) While such applications for exceptions to rule 37 were pending, the Railroad Commission, after due notice, held a public hearing on June 21, 1935, to determine whether special rules or orders constituting an exception to rule 37 should be adopted for the South Houston Oil Field, and determined to, and did, adopt the rules or orders complained of here on August 5, 1935. The portions of such special rules or orders pertinent here are best set forth by quoting them:

"It appearing to this Commission from evidence submitted to it at a hearing held after due notice in the above Cause at Austin, Texas on June 21, 1935, that 'waste' as defined in Article 6014, as amended, will result in the operation of wells in what is known as the South Houston Field in Harris County, Texas, unless rules, regulations and orders are adopted to prevent the same; and

"It further appearing that it is the duty of the Railroad Commission of Texas to prevent such 'waste' and that the enforcement of the regulations herein adopted will prevent waste of crude oil and natural gas as defined by law, and that an emergency exists requiring the immediate adoption of rules to govern said field:

"Therefore, it is ordered by the Railroad Commission of Texas, that in addition to the General Rules and Regulations governing said field, the following special rules and regulations be and the same are hereby adopted effective as of the date hereof.

"Rule 1. Within the corporate limits of the city of South Houston, spacing of wells shall be limited to that spacing set out in an ordinance passed and approved on the 14th. day of February, 1935, which ordinance established certain drilling districts consisting of Four (4) adjacent or contiguous blocks of the normal size of blocks in said city or approximately equal area and which ordinance further limits the drilling of wells within the corporate limits to one well to each drilling district. The said drilling districts are as designated by the City Council of the city of South Houston. Wells should be placed as nearly in the center of the established drilling districts as it is possible to do so under the terms of said ordinance, copy of which is hereto attached and made a part of this spacing rule. In event said ordinance is at any time repealed or becomes nonoperative the provisions as hereinafter set forth pertaining to the area outside of the corporate limits of South Houston shall become effective within the corporate limits."

Such rules or orders also make provision for the drilling of wells outside of the limits of the city, and provide that in the interest of protecting life and property and for other just and reasonable causes, the Railroad Commission reserves the right to enter special orders increasing or decreasing the minimum distances provided by the rules or orders.

After the adoption of such special rules or orders, the applications of Robertson, Yeager, and the Christys for such permits were denied by the Railroad Commission. Neither such persons nor plaintiff have made application to the Railroad Commission for permits since the adoption of such special rules or orders. It is these rules or orders that are the basis of plaintiff's complaint against the Railroad Commission.

(m) The evidence as to the nature of the South Houston Oil Field is contradictory. It sufficiently appears, however, that the field consists of the usual dome encountered in oil fields in the Gulf Coast country. That the producing oil sands are encountered at a level of about 4,700 feet, though gas sands are encountered at a higher level. There are at present no well-defined faults, though some indication that faults may be later encountered. There is danger that if the production of oil and gas is not wisely and carefully handled, the gas from the lower level will enter the upper level, causing cratering, blow-outs, etc. By carefully spacing the wells, this hazard, and likewise the fire hazard, is reduced. Generally speaking, it appears from the evidence here, as found by the Railroad Commission in the orders complained of, that waste will result in the production of oil and gas from such field, unless regulated by the commission, and there is no sufficient evidence to overturn the finding of the Railroad Commission that the spacing of one well to 16 acres is an efficient and

economical arrangement, which will result in the taking of the maximum of oil and gas from the field, and will prevent waste. There is no sufficient evidence that the order of the Railroad Commission complained of is, as charged by plaintiff, either arbitrary or unreasonable.

■ 1. Plaintiff contends that the Railroad Commission is without power to promulgate and enforce the orders complained of. The cases make it clear that the contention is unsound. The State's Conservation Laws, the right of the Legislature to confer upon the Railroad Commission the power to enforce them, the manner such power is conferred, and the authority of the Railroad Commission to promulgate and enforce reasonable rules and orders to that end, have been frequently upheld by both the state and federal courts. Likewise the power of the Railroad Commission to, as a conservation measure, establish reasonable drilling districts in oil and gas fields, prescribe the size thereof, space the wells therein, etc. MacMillan v. Railroad Commission (D. C.) 51 F.(2d) 400; F. C. Henderson, Inc., v. Railroad Commission (D. C.) 56 F.(2d) 218, 219; People's Petroleum Producers v. Sterling (D. C.) 60 F.(2d) 1041, 1042; Danciger Oil & Refining Co. v. Smith (D. C.) 4 F. Supp. 236, 237; Amazon Petroleum Corporation v. Railroad Commission (D. C.) 5 F. Supp. 633, 634; Melton v. Railroad Commission (D. C.) 10 F. Supp. 984. Likewise, the Conservation Laws of other states. Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276; Pennsylvania v. West Virginia, 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300; Hercules Oil Co. v. Thompson (D. C.) 10 F. Supp. 988; Lacy v. Railroad Commission (D. C.) 10 F. Supp. 990; President of United States v. Artex Refineries Sales Corporation (D. C.) 11 F. Supp. 189; Clymore Production Co. v. Thompson (D. C.) 11 F. Supp. 791; Brown v. Humble Oil & Refining Co. (Tex. Sup.) 83 S.W.(2d) 935, 941; Stewart v. Smith (Tex. Sup.) 83 S. W.(2d) 945; Smith v. Shabay (Tex. Civ. App.) 83 S.W.(2d) 719; Humble Oil & Refining Co. v. Railroad Commission (Tex. Civ. App.) 83 S.W.(2d) 695; Railroad Commission v. Bass (Tex. Civ. App.) 10 S.W.(2d) 586; Rabbit Creek Oil Co. v. Shell Petroleum Corporation (Tex. Civ. App.) 66 S.W.(2d) 737; Peterson v. Grayce Oil Co. (Tex. Civ. App.) 37 S.W.(2d) 367; Danciger Oil & Refining Co. v. Railroad Commission (Tex. Civ. App.) 49 S.W.(2d) 837; Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.(2d) 505; Barnsdall Oil Co. v. Railroad Commission (Tex. Civ. App.) 83 S.W.(2d) 714; Gulf Production Co. v. Railroad Commission (Tex. Civ. App.) 84 S.W.(2d) 359; Sun Oil Co. v. Railroad Commission (Tex. Civ. App.) 68 S.W.(2d) 609; Oxford Oil Co. v. Atlantic Oil & Producing Co. (D. C.) 16 F.(2d) 639; Oxford Oil Co. v. Atlantic Oil Producing Co. (C. C. A.) 22 F.(2d) 597, certiorari denied 277 U. S. 585, 48 S. Ct. 433, 72 L. Ed. 1000; Bandini Petroleum Co. v. Superior Court, 284 U. S. 8, 52 S. Ct. 103, 76 L. Ed. 136, 78 A. L. R. 826; Trimmier v. Carlton, 116 Tex. 572, 296 S. W. 1070; City of Denison v. Municipal Gas Co., 117 Tex. 291, 3 S.W.(2d) 794; Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W. (2d) 505; Texas & Pacific Motor Transp. Co. v. Railroad Commission, 124 Tex. ——, 73 S.W.(2d) 509; Spears v. San Antonio, 110 Tex. 618, 622, 223 S. W. 166; West Texas Compress & Warehouse Co. v. Panhandle & S. F. Ry. Co. (Tex. Com. App.) 15 S.W.(2d) 558, 560; City of San Antonio v. Jones, 28 Tex. 19, 33; 6 Ruling Case Law, § 178, pp. 177, 178.

■ 2. The only other question which needs be considered is whether the attacked orders of the Railroad Commission, providing for the spacing of the wells within the city, in conformity with the ordinance of the city, viewed in the light of the facts here, and of the cases cited, are unreasonable, arbitrary, and confiscatory, as claimed by plaintiff, and should be enjoined. The question must be negatively answered.

Interlocutory injunction against the Railroad Commission is denied.