## ADKINS v. CITY OF WEST FRANKFORT et al.

### Civil Action No. 339–D.

District Court, E. D. Illinois.

Sept. 7, 1943.

J. G. Van Keuren and Henry H. Harbour, both of DuQuoin, Ill., and C. E. Feirich, of Carbondale, Ill., for plaintiff.

Frank E. Trobaugh, of West Frankfort, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff instituted this suit against the City of West Frankfort and its corporate officers to enjoin enforcement of an or-

dinance passed February 9, 1943, regulating drilling for oil and gas and erection, maintenance and operation of equipment used in production of oil within the City.[1] Plaintiff now seeks a preliminary injunction and defendants, in addition to resisting this application, move to dismiss the complaint for want of equity.

[1] The relevant sections of the ordinance are, in substance, as follows:

Section 1. It shall be unlawful for any person to drill a well for oil and gas within the City without a permit for such well in accord with the provisions of the ordinance.

Section 2. The City is divided into 190 numbered tracts designated as drilling blocks.

Section 3. Not more than one well for oil and gas shall be drilled in any producing sand in any of the blocks except 30 named blocks in which two may be drilled. However, if more than one well shall be drilled outside the City limits within 400 feet of the boundary of any drilling block, an additional offset well may be drilled in such block to the sand to which the outside well is drilled at a location not more than 300 feet from the City limits.

Section 5. Where a permit is issued covering a portion of a drilling block, but not its remaining portions, the permittee shall deliver to the owners of land in the block not included in the drilling lease, a share of the royalties stipulated in the lease in proportion to their respective fractional areas of the drilling block, exclusive of streets and alleys of which the City is not the fee owner. In no event shall the royalty, delivered to such owners of land not leased, be calculated on the basis of less than one-eighth of the oil and gas. In the event the lease provides for smaller royalties, the additional rental shall be paid by the permittee. If any of the owners not included in the lease contract for division of his share with another, the royalty be distributed to the other person as required by the contract between such owner and the other party. If the owner not under the drilling lease refuses to provide separate storage for his share of the oil, the permittee shall have the right to purchase the share at the prevailing market price until storage has been provided.

Section 6. Where a permit is issued to a party who is the fee owner of a portion of a drilling block, but not of all the land in the block, the permittee shall deliver, as royalty, to the other owners in the block, a share of all oil and gas produced from such well equal to the proportion of the gross production that the area of land owned by such owner bears to the total area of land in the block. If any such owner assigns a portion of his interest, the permittee shall pay such part assigned to the assignee. If the owner refuses to provide separate storage for his share, the permittee may buy at the current market price, the share, until such storage is provided.

Section 7. (This section is very poorly drafted, but in substance seems to be as follows.) Where more than one application for a drilling permit is filed for one drilling block, the application shall be granted to the person holding the greatest area of land in the block by fee ownership, or by oil and gas lease. Other applications will be granted successively to the person who is the fee owner of or has oil and gas leases for the next largest area in the block. When a permit is issued to a party who does not own or lease all of the block, the owners of the land not covered by the lease may file with the City Clerk an election to pay the permittee proper shares of the total cost and expense of drilling, equipping and operating a well fixed at the proportions that the areas of such land owners lands bear to the total area of the block. Such land owner shall file a bond covering his share of the expenses. If such election be made by a holder of a lease or similar contract, such holder's interest in the well shall be only the pro rata part of the leasehold. If the election is made by the owner of unleased land in the drilling block, such owner shall have not only a pro rata part of the leasehold interest in said well but shall also be entitled to receive the royalty benefits as provided for in sections 5 and 6.

Section 9. Every person securing a permit under the ordinance shall pay to the owners of any buildings, improvements or chattels so located that the insurance rates or premiums have been increased by reason of maintaining or operating such well, any extra cost of fire insurance on such property caused by the operations carried on under such permit. Such person shall also pay any and all damages suffered by any person as to property within the City from fire, oil, gas and water caused by or originating from the drilling and operation of such well and deemed liable in a civil action for damages to such property in addition to any other relief or remedies provided herein.

Section 10. Every application for a permit shall be in writing, signed by the applicant, filed with the City Clerk accompanied by a deposit of $500. The application shall specify the drilling block and the location in the block where the proposed well is to be drilled, and contain an.

Bill, the owner of the oil and gas under certain property located in the city, on July 6, 1942, executed an oil lease to one Treadwell, who, on April 22, 1943, assigned it to plaintiff, who, desiring to drill, avers that the ordinance is invalid and that defendants have threatened to interfere and to prevent plaintiff from proceeding unless he complies with the ordinance. The assertion that the ordinance is unconstitutional largely resolves itself into two inquiries: (1) Has the city authority under the statutes to pass such an ordinance? (2) If the city has such statutory power, does the ordinance bear such a reasonable relation to the public health, convenience and welfare as to constitute a valid exercise of police power?

Under Ill.Rev.Stat. 1941, c. 24, § 23—76, a municipality has the power "to grant

---

estimate of the approximate cost and expense incident to drilling and equipping such well. There shall be attached a certified copy of each lease or contract which the applicant may have with owners of land in the block, and a plat or map of the block showing the exact location of the proposed well. The application shall be accompanied by a bond duly executed, for the benefit of the city and all persons concerned, conditioned that if the permit be granted, the applicant will comply with the terms of the ordinance; pay to the owners in the drilling block not covered by the drilling contract the royalties provided in the ordinance; restore all streets, sidewalks and other public places; remove all litter, machinery and buildings when the well is abandoned; fill in all slush pits and excavations; pay the city for an increase in cost of insurance on any property owned by the city; pay to the owners of any buildings, improvements, etc., any extra cost of insurance caused by reason of granting the permit; pay any and all damages suffered by any person to property in the city from fire over and above insurance collected, or from oil, gas or water when the damages originate from operations connected with applicant's drilling, completion and operations of such wells; and hold the city harmless from any and all liability growing out of such permit. The bond shall be in the sum of $5000. Each application for a permit shall also be accompanied by a public liability insurance policy for not less than $10,000 covering injury to one person and not less than $20,000 for injuries to more than one person in any one accident, the policy to cover the injuries or death to any persons not employees of permittee, resulting from the operation of drilling and producing oil and gas wells. Each applicant shall also procure a property damage insurance policy of not less than $10,000 for any one accident resulting in injury to or destruction of property. Such policies shall be kept in force so long as such well is continued in operation.

Section 11. An annual police regulation and inspection fee of $200 is levied upon each well operated or maintained to produce oil and gas. Any person paying the $500 permit fee shall not be required to pay any further fees for a period of one year.

Section 12. The City council shall have the power to refuse any application for a permit to drill by reason of the location of the proposed well and the character and value of the permanent improvements already erected on the drilling block in question or adjacent thereto, or because of the use to which the land and surroundings are adapted for civic purposes, or if, for sanitary reasons, the drilling of the well will be a serious disadvantage to the City and its inhabitants as a whole. If the application is refused, the deposit of each will be refunded.

Section 13. It shall be unlawful to erect any drilling rig within 300 feet of a residence, business or public building without enclosing it on all sides or without first obtaining the consent in writing and approval of the City Council and every rig shall be equipped with a fire extinguisher. All storage tanks, wells and equipment operated or maintained in connection with such a well shall be enclosed with a fence.

Section 15. No permit shall be issued for the drilling of a well except on land owned in fee by the applicant or held by the applicant under an oil and gas lease or similar drilling contract from the owner. A permit issued shall become inoperative unless operations shall have commenced within 120 days from the date of issuance. If the permittee does not continue drilling with due diligence and in a good workmanlike manner, the permit shall become inoperative. If production ceases for 120 days the permit shall become inoperative.

Section 20. Any violation of the ordinance shall be considered a misdemeanor and subject the offender to a fine not exceeding $200 and a person convicted shall be committed to jail until such fine is paid.

Section 22. The provisions of the ordinance are declared severable and if any part is held illegal and void by a court of competent jurisdiction. the remaining sections shall not be impaired.

permits to mine oil or gas, under such restrictions as will protect public and private property and insure proper remuneration for such grants."

■ The Act further provides, Sec. 23—105, that a municipality has the power: "To pass and enforce all necessary police ordinances." This provision is not concerned merely with organization and regulation of a police force; it embraces authority, under the general police power of the state, to pass and enforce all ordinances which may be reasonably necessary or proper to achieve accomplishment of regulation of all subjects and occupations, which, by other specific sections, authority is delegated to regulate and control. City Chicago v. Gunning System, 214 Ill. 628, 634, 73 N.E. 1035, 70 L.R.A. 230, 2 Ann.Cas. 892; Saxton v. Peoria, 75 Ill.App. 397; Consumer's Co. v. Chicago, 313 Ill. 408, 145 N.E. 114; Arms v. Chicago, 314 Ill. 316, 145 N.E. 407; Moy v. Chicago, 309 Ill. 242, 140 N.E. 845.

■ The police power includes authority over public health, safety, morals and general welfare. Village of La Grange v. Leitch, 377 Ill. 99, 35 N.E.2d 346; City of Chicago v. Clark, 359 Ill. 374, 194 N.E. 537; People v. Chicago, 261 Ill. 16, 103 N.E. 609, 49 L.R.A.,N.S., 438, Ann.Cas. 1915A, 292. Drilling for and producing oil and gas tends to create dangerous fire hazards. Under Section 23—72, granting power to cause all buildings and enclosures in dangerous fire condition to be put in a safe condition, the city is authorized to adopt all reasonable and necessary ordinances in regard to oil wells in order to diminish the inherent fire hazard.

■ Drilling for oil and gas has been subjected to regulation in statutes fixing the basis for appropriation of oil and gas from a common pool; Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; in limitation of the number of wells to be drilled in a given area, Oxford Oil Co. v. Atlantic Oil & Producing Co., D.C.N.D. Tex., 16 F.2d 639, affirmed 5 Cir., 22 F.2d 597; Van Meter v. H. F. Wilcox Oil & Gas Co., 170 Okl. 604, 41 P.2d 904; Cash v. Beveridge, 183 Okl. 310, 82 P.2d 665; and in zoning ordinances which prohibit drilling in certain districts, Marblehead Land Co. v. Los Angeles, 9 Cir., 47 F.2d 528, certiorari denied 284 U.S. 634, 52 S.Ct. 18, 76 L.Ed. 540; Cromwell-Franklin Oil Co. v. Oklahoma City, D.C.W.D.Okl., 14 F.Supp. 370. Indeed, ordinances with provisions substantially similar to that in question have been upheld. Marrs v. City of Oxford, 8 Cir., 32 F.2d 134, 67 A.L.R. 1336, certiorari denied, Ramsey v. City of Oxford, 280 U.S. 563, 50 S.Ct. 24, 74 L.Ed. 617; Tysco Oil Co. v. Railroad Comm. of Texas, D.C.S.D.Tex., 12 F.Supp. 195; Id., D.C.S.D.Tex., 12 F.Supp. 202. Clearly, under its statutory powers, the city has power to establish reasonable regulations for the drilling of oil wells within its boundaries.

Does the ordinance bear a reasonable relation to the public health, welfare and safety?

Oil and gas and the methods used in obtaining them from the subsurface are unique. Oil is a fugitive mineral and, if extracted at any one point of a pool, other oil will flow some distance to replace that taken. Thus, one drilling near his boundary, removes not only oil from his land but also some from his abutting neighbor. Adjoining lot owners have no choice, in order to protect their oil, but to sink an offset well. Results a mad rush to sink wells as quickly as possible and to reduce the oil to possession before the adjoining owner's well is completed.

Different lot owners may lease to divers rival oil companies. Many men and much material converge upon the field. Heavy drilling equipment, hauled over the streets, may leave them rough, rutted and dusty. Excavations are made, slush pits dug, and temporary buildings erected. With the opening of a new field also come hangers-on who move from field to field, a class of persons of dubious desirability, at least in part, lacking permanent home and the concomitant sense of responsibility. Following the more responsible and reliable oil pioneers, less responsible operators speculate on their predecessors' exploration with little cost or sense of responsibility. The continuous, disquieting noises of drilling and the unpleasant odors of fumes and other noxious gases prevalent about oil wells are not conducive to peaceful city residence. More serious is the constant threat of fire and explosion. All these conditions seriously affect the surrounding land, causing it to depreciate in value and desirability as residence property. Insurance rates may rise due to the danger of fire, and living may become well-

nigh unbearable to many of the city's permanent families, compelling them either to undergo much unpleasantness or move. Multiply these incidents of production by crowding several wells in each city block, and the problem becomes involved and serious.

West Frankford is a town of approximately 16,000 inhabitants. Oil lies in substantial quantities underneath at least a part of it. The council was faced with the problem of protecting the health, welfare and safety of the townspeople by avoiding the unpleasant incidents of production, at the same time trying to avoid depriving landowners of enjoyment of their valuable mineral rights. The ordinance represents its attempt to solve this question. It sought to legislate, not that drilling and production should be entirely excluded, but that the course of development should proceed within fixed limitations fair to both oil man and householder.

Generally speaking, the ordinance provides that one well, with certain exceptions, shall be drilled in a city block promptly, by the owner or the lessee of the largest amount of acreage within the block; and, to the owners not under contract with the driller, it gives the option to participate in the expense and to receive a proportionate share of the oil produced; or, if such owner does not care to undertake such a venture, it gives him a proportionate royalty in the oil produced.

The ordinance is not as clear or satisfactory as it might be. But a classification having some reasonable basis does not offend merely because it is not made with mathematical nicety or because in practice it results in some inequality. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160. Even if the restrictions imposed are considered either doubtful or fairly debatable, courts may not ordinarily substitute their judgment for that of the legislative body. Village of Western Springs v. Bernhagen, 326 Ill. 100, 156 N.E. 753; Minkus v. Pond, 326 Ill. 467, 158 N.E. 121; Reschke v. Winnetka, 363 Ill. 478, 2 N.E.2d 718.

The decisive principle is largely that involved in zoning ordinances, which, unless obviously unreasonable or grossly discriminatory, are upheld. Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1030; City of Aurora v. Burns, 319 Ill. 84, 149 N.E.

784; Spann v. Dallas, 111 Tex. 350, 235 S.W. 513, 19 A.L.R. 1395; Fitzhugh v. City of Jackson, 132 Miss. 585, 97 So. 190, 33 A.L.R. 287; State ex rel. Austin v. Thomas, 96 W.Va. 628, 123 S.E. 590, 38 A.L.R. 1496; City of Youngstown v. Kahn Brothers Building Co., 112 Ohio St. 654, 148 N.E. 842, 43 A.L.R. 668; State of Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210, 86 L.R.A. 659; Arverne Bay Const. Co. v. Thatcher, 278 N.Y. 222, 15 N.E.2d 587, 117 A.L.R. 1117. Thus, the court said in Euclid v. Ambler Realty Co., supra, 272 U.S. at page 386, 47 S.Ct. at page 118, 71 L.Ed. 303, 54 A.L.R. 1016: "Building zone laws are of modern origin. * * * Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation." And the Supreme Court of Illinois expressed similar thought in City of Aurora v. Burns, supra, 319 Ill. at pages 93-95, 149 N.E. at page 788:

"The constantly increasing density of our urban populations, the multiplying forms of industry, and the growing complexity of our civilization, make it necessary for the state, either directly or through some public agency by its sanction, to limit individual activities to a greater extent than formerly. With the growth and development of the state the police power necessarily develops, within reasonable bounds, to meet the changing conditions. * * *

"The harmless may sometimes be brought within the regulation or prohibition in order to abate or destroy the harmful. The segregation of industries, commercial pursuits, and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety, and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of

fires, and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. * * *

"It is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder, and dangers which often inhere in unregulated municipal development."

In Marblehead Land Co. v. Los Angeles, 9 Cir., 47 F.2d 528, certiorari denied 284 U.S. 634, 52 S.Ct. 18, 76 L.Ed. 540, certain property, placed in a residential zone, was worth for residence purpose about $10,000 per acre. Experts concluded that oil underlay the land, which would increase the value many millions of dollars. Plaintiff sought to enjoin an ordinance, which forbade drilling, contending that, since there was no dwelling house less than 1,100 feet from the proposed well, the land was unimproved, and its value, if oil were extracted, would be so much greater, the ordinance was unreasonable and invalid. Testimony was offered pro and con as to the fire hazard, pollution of air and other inconveniences resulting from operation. The court affirmed authority of the city to limit the class of structures which might be erected and the kind of business which might be maintained within its various areas, saying at page 533 of 47 F.2d: "It is a matter of common knowledge that in some cases oil wells, particularly in new territory, have gotten beyond control and resulted in disastrous fire. Such a well in the heart of a great city would be an intolerable nuisance, and it is conceded could be prohibited by the city council in the exercise of its police power. In an outlying and relatively unsettled district it is obvious that the fire hazard would be much less, if not entirely negligible. The city council presumptively acted upon the theory that such a hazard was real and substantial. The trial court, after hearing the evidence, held it to be a fact that the fire hazard was real and substantial. There is testimony to sustain this conclusion. The question then is whether this court * * * shall declare that the conclusions of the city council and of the trial judge are so arbitrary and unreasonable that they may be justly disregarded as determining the rights of the appellants. In this connection it should be observed that, in passing upon the conclusions of the trial court, or the local legislative body, the appellate court should give great weight to the determination of local authorities and the local courts especially familiar as they are with local conditions." Zoning ordinances prohibiting drilling for oil in certain restricted zones were also upheld in Cromwell-Franklin Oil Co. v. Oklahoma City, D.C.W.D.Okl., 14 F.Supp. 370, and K. & L. Oil Co. v. Oklahoma City, D.C. W.D.Okl., 14 F.Supp. 492.

Our problem is not precisely that of the ordinary zoning ordinance. But if a municipality has the power, in a zoning ordinance, to prohibit drilling entirely, under its power to protect the health, safety and welfare of the community, it surely has the lesser power to limit the number of wells and the conditions under which they may be drilled and operated.

In Tysco Oil Co. v. Railroad Commission of Texas, D.C.S.D.Tex., 12 F.Supp. 195, the city covered some 1,306 acres of land, divided into some 302 blocks, containing about 4,490 lots. In the city were 318 buildings, including 157 residences, 64 business houses, 18 of which were used for storing explosive fire works, 5 filling stations, 2 churches, 2 schools, and buildings housing a county hospital for transient persons. The ordinance prescribed a permit and divided the city into drilling districts of 16 acres each, in each of which only one well could be drilled. If the permittee did not own all the leases in an area, he was bound to deliver to each owner whose property was in the district but was not included in his leases, free of cost, a share of the oil produced from such well equal to that proportion of one-eighth of the whole production which the area of such non-leasing owner bore to the total area of the district. If more than one applied, the permit was to be granted to the person holding the largest area in the block under lease, contract, or in fee. If the permit issued to one who did not own in fee or by lease or contract, the right to drill for the whole block, any person owning unleased land in or holding a lease on other parts of block was to share in the oil produced in the proportion that his area bore to that of the entire district provided he elected to pay the permittee a like proportion of the expense. The court held the ordinance not unreasonable, arbitrary or confiscatory.

In the companion case, Tysco Oil Co. v. Railroad Commission of Texas, D.C., 12 F.

Supp. 202, petitioner sought an injunction. The court said at page 203 of 12 F.Supp.: "The facts show that the 4,490 lots in the city are owned by approximately 2,000 different persons, * * *. In the absence of some regulation, each of such 2,000 persons could drill a well on his lot, creating thereby, by reason of the dangers from escaping gas, explosions, fire, cratering, etc., a menace to life and property. Clearly the city owed the duty to its inhabitants and to the hundreds of people who daily pass through its limits over the rail and electric roads and the highways to protect them from such a menace. * * * Considering the dangers from the escape of gas, explosions, fire, cratering, etc., incident to the drilling of wells, and the production of oil and gas, the evidence here wholly fails to show that the limitation of one well on each drilling district of 16 acres is either arbitrary or unreasonable."

In Marrs v. City of Oxford, 8 Cir., 32 F. 2d 134, 67 A.L.R. 1336, certiorari denied Ramsey v. City of Oxford, 280 U.S. 563, 50 S.Ct. 24, 74 L.Ed. 617, as here, plaintiffs sued before its application had been rejected. Defendants admit that the Marrs ordinance was the basis for the West Frankfort ordinance. The sections of the latter are similar to those of the former except 6, 11, 14, 19, 21 and 22, though they are not so clear or concise. In upholding the ordinance, the court said, at page 139 of 32 F. 2d: "Notwithstanding the allegations of the bill, it seems undeniable to us that when work of the kind under consideration is carried on in residential or business sections of a town or city without some limit to the number of wells in a given area, they will necessarily become nuisances of a most aggravated sort to its inhabitants and its business interests. There will be annoyance from unsightly structures, disquieting noises of machinery, the immediate and constant presence of numbers of workmen and the persistent thought of impending danger from explosion and conflagration because of the highly inflammable nature of the product. Such a situation calls for some governmental restriction and control. The greater the number of wells in a city block the greater will be the annoyance and hazards to the public. Indeed, it would be hard to say that an ordinance prohibiting the drilling and operation of any well within the business or residential districts of a city would be an unreasonable and invalid exercise of the police power. We do not doubt the validity of the ordinance here challenged. Its requirements and regulations are in protection of the public welfare, effective if enforced to accomplish that purpose; and the passage and adoption of it cannot in our judgment be justly said to be an arbitrary and unreasonable exercise of the city's power."

The city has not refused plaintiff a permit. Apparently plaintiff made application, but before the city could act, instituted suit to enjoin the ordinance contending that to require it to comply with its terms was to exceed constitutional power.

A rather similar situation existed in Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016. There plaintiff sought to enjoin the ordinance, declaring that it was unconstitutional and that threat of enforcement materially illegally affected the value of its land. There, as here, plaintiff made an attack upon many specific provisions, but the court, upholding the ordinance in its general scope, said in 272 U.S. at page 395, 47 S.Ct. at page 121: "It is true that when, if ever, the provisions set forth in the ordinance in tedious and minute detail come to be concretely applied to particular premises, including those of the appellee, or to particular conditions or to be considered in connection with specific complaints some of them, or even many of them may be found to be clearly arbitrary and unreasonable. But where the equitable remedy of injunction is sought, as it is here, not upon the ground of a present infringement or denial of a specific right or of a particular injury in process of actual execution, but upon the broad ground that the mere existence and threatened enforcement of the ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constitute a present and irreparable injury, the court will not scrutinize its provisions, sentence by sentence, to ascertain by a process of piecemeal dissection whether there may be, here and there, provisions of a minor character, or relating to matters of administration, or not shown to contribute to the injury complained of, which, if attacked separately, might not withstand the test of constitutionality. In respect of such provisions, of which specific complaint is not made, it cannot be said that the land owner has suffered or is threatened with an injury which entitles him to challenge their constitutionality."

In Marrs v. City of Oxford, D.C.Kan., 24 F.2d 541, affirmed 8 Cir., 32 F.2d 134, 67 A.L.R. 1336, plaintiff sought an injunction before the city had denied its application. After upholding the ordinance, the court held it unnecessary to review the details of the various sections of the ordinance, relying on the language in the Euclid case. See Railroad Commission Cases (Stone v. Farmers' Loan & Trust Co.), 116 U.S. 307, 335, 6 S.Ct. 334, 388, 1191, 29 L.Ed. 636; Turpin v. Lemon, 187 U.S. 51, 60, 23 S.Ct. 20, 47 L.Ed. 70.

But plaintiff contends that certain specific requirements nullify the ordinance. It asserts that section 3 is discriminatory since it allows only one well in each of 160 blocks but permits two in each of 30. That in which plaintiff seeks to drill is limited to one, while all other blocks abutting the northern boundary of the city, except one, are permitted two. An examination of the various blocks indicates, however, that those where two wells may be drilled contain considerable larger areas. Obviously, in the absence of evidence justifying the contrary, I should not interfere with the city's conclusion that, in view of this larger area, the public health, safety and welfare would not be any more seriously harmed or threatened by the presence of two wells in such blocks, than by one only in each of the other 160. I may not, on this record, say that the legislative discretion was arbitrarily exercised. Furthermore, there is no averment that plaintiff seeks to drill more than one well.

Plaintiff insists that section 3 is discriminatory also in that it provides for an additional well as an offset to those outside the city limits. He contends that if, after a well is completed in any block, a well outside the city is drilled, abutting the block drilled, which drains the well on the latter, no additional well to offset this drain can be drilled in the block. No present necessity of any offset well is shown to exist. That question can be considered only when the situation makes the point one of relevant legal interest.

Plaintiff avers that under section 5, he will be compelled to pay part of the rental provided to be paid lessor to other land owners in the block, in proportions equal to the ratios their areas bear to the total area. This, he says, amounts to impairment of his contract.

This method of distribution was upheld in the Marrs and Tysco Oil Company cases, supra, as a reasonable means of protecting all land owners. Nor does it matter in this connection that plaintiff's lease was executed before the ordinance was adopted, for, if the police power of a city has been reasonably exercised, all contract and property rights are subject to it, and all citizens contract subject to its legitimate exercise. Chicago & A. R. Co. v. Tranbarger, 238 U.S. 67, 76, 35 S.Ct. 678, 59 L.Ed. 204; Atlantic Coast Line R. Co. v. Goldsboro, 232 U.S. 548, 558, 34 S.Ct. 364, 58 L.Ed. 721; Cromwell-Franklin Oil Co. v. Oklahoma City, D.C.W.D.Okl., 14 F.Supp. 370, 378. " 'All contracts * * * are subject to be interfered with or otherwise affected by subsequent statutes (or ordinance) enacted in the bona fide exercise of the police power' * * * 'All contract and property rights are held subject to its fair exercise.' " State Public Utilities Comm. v. Quincy, 290 Ill. 360, 125 N.E. 374, 376. "Private rights must yield to consideration of the public safety, health, morals, and welfare, and no investment in property, however large, will preclude the exercise of the governmental power of regulation when reasonably necessary for these purposes." Schiller Piano Co. v. Illinois Northern Utilities Co., 288 Ill. 580, 123 N.E. 631, 634, 11 A.L.R. 454. See, also, Integrity Mut. Ins. Co. v. Boys, 293 Ill. 307, 127 N.E. 748; Ward v. Farwell, 97 Ill. 593.

Plaintiff contends that the term "land owners," designating the parties who shall share in the royalties, is vague and uncertain, since it can not be determined whether it is meant to include owners of surface or owners of mineral rights. Since no permit has been denied or granted to plaintiff and no well has been drilled, and the time for distribution has not arrived, this question is now only academic. If doubt exists as to the meaning of "land owners" it will have to be resolved at the time the matter of distribution is presented.

Plaintiff asserts invalidity in that this section provides that owners not included in the lease shall nevertheless share in the royalty stipulated in the lease, provided, however, that such royalty shall not be less than one-eighth. Since the lease under which plaintiff seeks to drill provides for one-eighth, that question is not before this court as a litigated issue.

Plaintiff's objections to section 6 are substantially the same as those to section 5 and

the reasons for denying the latter also exist as to the former.

Section 7 is attacked as unintelligible. The section is inaptly drawn and is difficult of comprehension. It stipulates who shall have preference in obtaining a permit and that a landowner whose property is not under lease may elect to share the expenses of drilling the well, and, upon filing bond conditioned for such payment, will be entitled to a pro rata share of the proceeds. Whether in subsequent litigation, when the question is relevant, this section may be held so vague as to be invalid is not to be decided here, where there is no question as to priority of drilling permits, or as to the right of election of landowners to share in the venture.

Section 9 is almost literally copied from the ordinance in the Marrs case. Permitting a well to be drilled threatens damage to adjoining property by fire and explosions and insurance premiums may increase because of the hazard. The burden of paying any increased premiums placed upon the driller will be slight in comparison to the value of the oil extracted. I think that the attempt of the city to protect its citizens, in this respect is a valid exercise of its police powers. Further, there is no showing that plaintiff has in any way been injured by this provision or that he will be compelled to pay insurance premiums. Nor is it shown that insurance premiums of adjoining property owners have increased. If and when such an event arrives, he may present his complaint in a proper court.

Section 10 is declared invalid because it requires a surety bond conditioned that the driller will pay all damage suffered by any person as a result of operations connected with the drilling, completion and operation of the wells. In addition, the permittee is required to file a public liability insurance policy for injuries arising out of drilling operations. A proper bond is a valid requirement. Julian Oil & Royalties Co. v. Oklahoma City, 167 Okl. 384, 29 P.2d 952; Gant v. Oklahoma City, 150 Okl. 86, 6 P.2d 1065, 86 A.L.R. 794; Gant v. Oklahoma City, 289 U.S. 98, 53 S.Ct. 530, 77 L.Ed. 1058. As the court said in Gant v. Oklahoma City, 150 Okl. 86, 6 P.2d 1065, 1070, 86 A.L.R. 794: "Nothing has been shown indicating that the giving of this bond would in any manner interfere with the lawful rights of the plaintiff below. It may be their misfortune that they do not get all they want, but the right of life and property, and to enjoy the gains of their own industry, is guaranteed to every person in the city of Oklahoma City, by the state Constitution. Considering its size and cost, and considering the probable profits, it is not unreasonable as compared to the property of others endangered. As compared to the hazard to human life, it is a bagatelle."

However, plaintiff it quite correct in its contention that it can not properly be made absolutely liable for any damage incurred regardless of legal liability. Under the ordinance, plaintiff, before he can obtain a permit, must file with the city a good and sufficient bond conditioned to pay all damages regardless of whether they are those for which it is legally liable. This is imposition of responsibility for all damages irrespective of legal liability and, therefore, is unreasonable and arbitrary. Thus, where a statute attempted to render a railroad company liable for all expenses of the coroner and burial expenses where persons were killed by collision or other accidents, without regard to negligence or violation of the statute, the Supreme Court of Illinois held the statute a violation of the "constitutional inhibition against imposing penalties where no law has been violated or duty neglected." Ohio & M. Ry. Co. v. Lackey, 78 Ill. 55, 20 Am.Rep. 259. So, here, to require an assumption of penalties, as a condition precedent to issuance of a permit, where no law is violated or duty neglected, is to impose an unconditional burden upon plaintiff. For this reason, alone, if for no other, plaintiff is entitled to an injunction.

Sections 12 and 13 are claimed to be invalid since, in each, the council may refuse or grant permits at its discretion. Plaintiff declares this so lacking in standards of guidance as to render the sections invalid. Welton v. Hamilton, 344 Ill. 82, 176 N.E. 333. However, the council has not refused plaintiff a permit or exhibited any threat of acting arbitrarily or discriminatorily. If, at some later date it should arbitrarily deny plaintiff a permit, the question may become pertinent.

I do not intend that this memorandum shall indicate approval of many portions of the ordinance which are attacked. The provisions of the ordinance, set forth in minute detail, frequently, by inapt expressions and ambiguous terms, when applied to particular premises or conditions, specifi-

cally complained of, may be found to be arbitrary and unreasonable. I hold merely that, until those situations arise, plaintiff is in no position to complain. What may be the decision when and if a cause of action ripens under any of the provisions remains wholly undetermined.

I conclude that plaintiff should succeed because the ordinance requires of him an assumption of penalties not imposed by law as a condition precedent to allowance of a permit. The motion for a temporary injunction is allowed and defendants' motion to dismiss is denied.

The foregoing includes my findings of fact and conclusions of law.